C. D. Michel – SBN 144258
cmichel@michellawyers.com
Joshua Robert Dale – SBN 209942
jdale@michellawyers.com
Konstadinos T. Moros – SBN 306610
kmoros@michellawyers.com
Alexander A. Frank – SBN 311718
afrank@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile:   (562) 216-4445
www.michellawyers.com

Attorneys for Plaintiffs California Rifle & Pistol Association and Gun Owners of California, Inc.

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorney for Plaintiff Second Amendment Foundation

**IN THE UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED; SECOND AMENDMENT FOUNDATION; GUN OWNERS OF CALIFORNIA, INC, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF GLENDALE; GLENDALE CHIEF OF POLICE CARL POVILAITIS, in his official capacity; GLENDALE CITY CLERK SUZIE ABAJIAN, in her official capacity; and DOES 1-10, <br><br> Defendants. | **CASE NO: 2:22-cv-07346-SB-JC** <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> **Hearing Date: December 2, 2022** <br> **Hearing Time: 8:30 AM** <br> **Courtroom: 6C** <br> **Judge: Hon. Stanley Blumenfeld Jr.** |

1

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS ..................................................................................i

TABLE OF AUTHORITIES ..........................................................................iii

1.    INTRODUCTION AND BACKGROUND.................................................1

2.    LEGAL STANDARD APPLICABLE TO MOTION...................................3

3.    ARGUMENT ............................................................................................4

    A.    Plaintiffs Are Likely to Succeed on the Merits ...............................4

        i.    Historical analysis under the Second Amendment.................4

        ii.    Under *Bruen*, even the existence of several historical analogues is not enough, there must be evidence of a well-represented historical tradition.................................................5

        iii.    Sensitive places are narrowly defined under *Bruen*...............9

        iv.    The Ordinance violates the Second and Fourteenth Amendments because it is not consistent with our historical tradition of firearm regulation. ...............................................10

        v.    The only relevant historical examples are insufficient analogues to support the Ordinance because they did not aim to prohibit peaceable carry, or they are historical outliers........................................................................................13

        vi.    The Ordinance violates due process by depriving Plaintiffs' members of notice as to which places are off limits for carry. ....................................................................................16

    B.    Plaintiffs' Members Will Suffer Irreparable Harm if Denied Relief.............................................................................................17

    C.    The Balancing of the Equities Sharply Favors Plaintiffs...............18

i

i.    **The Constitution forbids restricting protected conduct on the basis of a claimed "public safety" rationale.  18**

ii.    **Even if the City could consider public safety interests, which it cannot, it would not prevail because people with carry permits commit crimes at a lower rate than the public at large.** ........................................................................ **19**

D.    **PRELIMINARY INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST** ....................................................................... **22**

4.    **CONCLUSION** ........................................................................ **22**

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) .................................................................. 18

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) .................................................................... 3

*Antonyuk v. Hochul*,
  No. 1:22-CV-0986, 2022 U.S. Dist. LEXIS 182965 (N.D.N.Y. Oct.
  6, 2022) ................................................................................................*passim*

*Bonidy v. United States Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015) (Tymkovich, J. dissenting) ..................... 12

*Carrillo v. Penn Nat'l Gaming, Inc.*,
  172 F. Supp. 3d 1204 (D.N.M. 2016) ........................................................ 15

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ......................................................................... 4, 6, 19

*Duncan v. Becerra (Bonta)*,
  265 F. Supp. 3d 1106 (S.D. Cal. 2017) ..................................................... 18

*Elrod v. Burns*,
  427 U.S. 347 (1976) ................................................................................... 18

*Ezell v. Chicago*,
  651 F.3d 684 (7th Cir. 2011) .................................................................... 18

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) ................................................................... 22

*Lambert v. California*,
  355 U.S. 225 (1957) ................................................................................... 17

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ....................................................................... 4, 18, 19

*McMahon v. City of Panama City Beach*,
  180 F. Supp. 3d 1076 (N.D. Fla. 2016) ..................................................... 15

iii

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) .............................................................. 17

*Monterey Mech. Co. v. Wilson,*
    125 F.3d 702 (9th Cir. 1997) .............................................................. 18

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. ___, 142 S. Ct. 2111 (2022) ........................................*passim*

*Nordyke v. King,*
    563 F.3d 439 (9th Cir. 2009) .............................................................. 12

*Oliver v. United States,*
    466 U.S. 170 (1984) (Marshall, J., dissenting) .................................. 15

*People v. Leon,*
    181 Cal. App. 4th 943 (Ct. App. 2010) .............................................. 16

*Preminger v. Principi,*
    422 F.3d 815 (9th Cir. 2005) .............................................................. 22

*Rodriguez v. Robbins,*
    715 F.3d 1127 (9th Cir 2013) ............................................................. 18

*United States v. Byle,*
    No. 8:10-CR-419-T-30TGW, 2011 U.S. Dist. LEXIS 54220 (M.D.
    Fla. Apr. 15, 2011).............................................................................. 15

*Valle del Sol Inc. v. Whitting,*
    732 F.3d 1006 (9th Cir. 2013) ............................................................ 18

**Statutes**

California Code of Civil Procedure § 1021.11 .................................... 18, 22

California Penal Code § 16150........................................................................ 2

California Penal Code § 16250........................................................................ 3

California Penal Code § 16520........................................................................ 3

California Penal Code § 16700(a) ................................................................... 3

Glendale Cal. Municipal Code 9.25.020(J) .................................................... 2

iv

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

Glendale Cal. Municipal Code 9.25.030 ..................................................... 3

Glendale Cal. Municipal Code § 9.25.030(K) ........................................... 11

Glendale Cal. Municipal Code § 9.25.040 ........................................... 1, 2

Glendale Cal. Municipal Code § 9.25.040(A) ..................................... 1, 22

Glendale Cal. Municipal Code § 9.25.050(G) ........................................... 3

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

## 1.  INTRODUCTION AND BACKGROUND

In this matter, Plaintiffs are non-profit civil rights organizations representing their members who have CCW permits and are affected by Glendale Municipal Code section 9.25.040(A). They bring this action against Defendants City of Glendale, Glendale Chief of Police Carl Povilaitis, and Glendale City Clerk Suzie Abajian (collectively "the City" or "Defendants") to vindicate their Second Amendment rights, or the rights of their members, to publicly bear arms for self-defense in the City of Glendale. Plaintiffs have submitted declarations about how the Ordinance affects the interests of their members with CCW permits. (*See* Declaration of Alan Gottlieb in Support of Motion for Preliminary Injunction; Declaration of Sam Paredes; and Declaration Richard Minnich of CRPA.)

Glendale Municipal Code § 9.25.040(A) (the "Ordinance"), in relevant part, generally bans possession on "city property" of any ammunition or firearm, whether loaded or unloaded. The term "city property" is defined to include effectively all public property within the City of Glendale, as well as some private property, with the only exception being streets/roads and sidewalks. In sum, other than streets/roads and sidewalks, the Ordinance makes it unlawful for the typical, law-abiding person to possess a firearm or ammunition on any public property or publicly controlled-property in the City of Glendale. The Ordinance provides:

"No person shall:

"A.   Bring onto or possess on city property:

"1.    A firearm, loaded or unloaded.

"2.    Ammunition for a firearm."

GLENDALE, CAL. MUNICIPAL CODE § 9.25.040.

The term "city property" in the Ordinance:

---
1

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

> Means real property, including any buildings thereon, owned, leased, or subleased by the City of Glendale ("city") and in the city's possession—or in the possession of a public or private entity, corporation, or person under contract with the city to perform a public purpose—including, but not limited to, the following property: parks, playgrounds, open space, plazas, community centers, facilities (including the Glendale Civic Auditorium, the city's civic center complex, and city libraries), parking lots, and parking structures.

*Id.,* § 9.25.030. The term, however, "[d]oes not include the public right-of-way owned by the city, including any area across, along, on, over, upon, and within the dedicated public alleys, boulevards, courts, lanes, roads, sidewalks, streets, and ways within the city." *Id*.

As of 2013, when the City made legislative findings concerning the Ordinance, City Property on which firearms were banned included, but was not limited to: 47 parks and recreation facilities (including four community centers, one golf course, three soccer fields, and sixteen ball fields), all City playgrounds, eight public libraries, three downtown parking structures and other City-owned or operated parking lots, the Glendale Civic Auditorium and civic center complex, a youth center, an emergency center,  undefined "open spaces" and "plazas", and an unknowable amount of properties in the possession of private companies or individuals under contract with the city. GLENDALE, CAL. MUNICIPAL CODE 9.25.020(J). Plaintiffs are not aware what other property the City may own that was not listed in the 2013 findings (including property the City may have acquired or taken under its control since those findings were made) but any such property would be included as well.

The term "ammunition" as used in the Ordinance "means any ammunition as defined in California Penal Code section 16150 []." *Id*., § 9.25.030. California Penal Code section 16150 includes as "ammunition" (1) any "loaded cartridges consisting of a primed case, propellant, and with one or more projectiles;" and (2) "any bullet, cartridge, magazine, clip, speed loader, autoloader, ammunition feeding device, or projectile capable of being fired from a firearm with a deadly consequence," but "does not include blanks."

2

The term "firearm" as used in the Ordinance "Means any gun, pistol, revolver, rifle, or any device, designed or modified to be used as a weapon, from which is expelled through a barrel a projectile by the force of an explosion or other form of combustion," including any "firearm" as defined in California Penal Code section 16520; any "BB device" as defined in California Penal Code Section 16250; and any "imitation firearm" as defined in California Penal Code Section 16700(a). GLENDALE, CAL. MUNICIPAL CODE 9.25.030.

The only exceptions to the Ordinance apply to specific, limited groups of people, such as law enforcement, military, security guards, those delivering firearms or ammunition to Glendale police, and authorized participants in entertainment productions, or to persons lawfully relinquishing their firearms to Glendale police. *Id.*, § 9.25.050.[1] There is no exception for people with valid CCW permits, and thus Plaintiffs' members with CCW permits may not carry in many portions of the City of Glendale. Further, the City's Municipal Code contains no requirement that places where possessing a firearm is forbidden put up signs announcing that fact. Given how many places where carry is forbidden that would not be obvious (parks, City-run parking lots and structures, private businesses under contract with the City, etc.), Plaintiffs' members have no way to know that many places forbid carry even with a CCW permit.

## 2.   LEGAL STANDARD APPLICABLE TO MOTION

To obtain a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 55 U.S. 7, 20 (2008)).

---

[1] There is an exception for "using the City's target range" but it is meaningless because no such range exists. GLENDALE, CAL. MUNICIPAL CODE § 9.25.050(G).

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

3.    **ARGUMENT**

    A.    **Plaintiffs Are Likely to Succeed on the Merits**

        i.    **Historical analysis under the Second Amendment.**

In 2008, the United States Supreme Court held that the Second Amendment protects an individual right to keep and bear arms. *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Heller* described the right to self-defense as the "central component" of the Second Amendment right. *Id*. at 628. Two years later, the Supreme Court confirmed that said right is fundamental and then, through the Fourteenth Amendment, incorporated it to protect against state and local infringement. *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

Most critically, the *Heller* Court established a "text, history, and tradition" framework for analyzing Second Amendment questions. The Court then assessed historical evidence to determine the prevailing understanding of the Second Amendment at the time of its ratification in 1791, and thereafter. Based on that assessment, the Court concluded that the District of Columbia statute prohibiting possession of the most commonplace type of firearm in the nation (the handgun) lacked a revolutionary era analog, did not comport with the historical understanding of the scope of the right, and therefore violated the core Second Amendment right. *Heller*, 554 U.S. at 629.

This year, the Supreme Court reaffirmed the validity of the historical understanding approach for analyzing Second Amendment questions and recognized that the Second Amendment protects the right to armed self-defense in public just as much as in the home. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ___, 142 S. Ct. 2111, 2134-35 (2022) ("*Bruen*"). The *Bruen* Court reiterated that courts may not apply a "means-ends" "interest-balancing" test akin to "intermediate scrutiny" in Second Amendment cases. *Id*. at 2129. Instead, courts must inspect the historical records of the ratification era and then apply analogical

analysis to determine whether the modern-day restriction infringes on Second Amendment rights. *Id*. at 2129-30.

The *Bruen* court clarified in crystal-clear language how proper Second Amendment analysis shall be applied:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 2126.

But the Court cautioned that not all history is created equal: "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. "[T]o the extent later history contradicts what the text says, the text controls." *Id.* at 2137. The Court also made clear that the kind of historical tradition the government must prove is "an enduring American tradition of state regulation." *Id*. at 2155-56.

### ii. Under *Bruen*, even the existence of several historical analogues is not enough, there must be evidence of a well-represented historical tradition.

Crucially, even if there is *some* relevant history of a type of gun control law, it is not sufficient to meet the standard set by the Court when the proposed historical analogue is an outlier, or a law that was not what the majority of states at the time embraced. The historical law must instead be a "well-established and representative historical analogue." *Id*. at 2133. Courts may not uphold a challenged law just because a few similar laws may be found in the past, because doing so "'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id*. (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)).

5

POINTS & AUTH. IN SUPPORT OF PLA' MTN. FOR PRELIMINARY INJ.

For example, in *Bruen*, the Court held that the historical record presented by New York was insufficient to establish a historical tradition. Recall that New York presented, and the Court discussed, three laws from the colonial era, three turn of the 18th Century laws, three 19th Century laws, and finally, five late 19th Century regulations from the Western Territories. *Id*. at 2138-56. <u>All of that history was deemed an insufficient historical tradition to uphold New York's Sullivan Act</u>. The Court emphasized that, as in *Heller*, it will not stake its interpretation of the Second Amendment upon historical outliers that contradict the overwhelming weight of other evidence regarding the right to bear arms in public for self-defense. *Id*. at 2153.

Further, the Court explained that late-19th Century evidence is relevant only when it provides confirmation of what had already been established before and "'postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text'." *Id*. at 2137 (quoting *Heller v. District of Columbia*, 399 U.S. App. D.C. 314, 344 n.6 (2011) (Kavanaugh, J., dissenting)). 20th Century evidence is even less relevant, with the Court not spending any time discussing it at all except in a brief footnote: "We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

While the Court noted that "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to determining whether a law is consistent with historical tradition, it cautioned that reasoning by analogy in such cases must be constrained by an inquiry into both "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. at 2133. What's more,

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

*Bruen* makes clear that reasoning by analogy is appropriate only when "unprecedented societal concerns or dramatic technological changes" make the search for a dead-ringer futile. *Id*. at 2132.

That does not apply in this matter. This case is "fairly straightforward" because "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131. People carrying firearms is not novel in American history, and the City is thus limited to finding representative historical analogues that are very closely similar to its Ordinance's restrictions, if not identical. "[G]enerally, a historical statute cannot earn the title "analogue" if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 182965, at *20 (N.D.N.Y. Oct. 6, 2022).

Whether a proposed analogue law from the past is sufficiently similar to the modern law comes down to "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133. Once a qualifying analogue has been identified, *then* the government must show that it imposes a comparable burden on the right of armed self-defense as the modern law at issue. It would not be enough for comparable 19th century laws to be superficially similar if the burden they placed on the right of armed self-defense was much lesser than the modern law.

Finally, following *Bruen,* some government respondents in other federal cases have taken to shamelessly citing racist and discriminatory laws as their historical analogues.[2]  While Plaintiffs are confident that to plead its case the City

---

[2] Jacob Sullum, *The Biden Administration Defends the Federal Ban on Gun Possession by Medical Marijuana Users,* Reason Magazine, (August 9, 2022, 4:50 PM), <https://reason.com/2022/08/09/the-biden-administration-defends-the-federal-ban-on-gun-possession-by-medical-marijuana-users/> (as of August 17, 2022) ("Toward that end, the Justice Department notes that 'in England and in America

7

would never rely upon Jim Crow laws and other discriminatory laws pretextually justified to suppress disfavored groups rather than fairly interpret and validly apply the Bill of Rights, it should nevertheless be clear that such laws cannot provide a valid historical analogue even if relied upon.

In ruling on *Bruen*, the Court did not discuss the plethora of discriminatory laws that existed at the time which prevented people in certain marginalized groups (such as free African Americans, Native Americans, Catholics, and others) from possessing firearms, or made it more difficult for them to do so. *See*, *e.g.,* Clayton E. Cramer, *The Racist Roots of Gun Control*, KAN. J.L. & PUB. POL'Y, Winter 1995, at 17 (arguing that many early American gun laws were designed to disempower racial minorities); and Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 333-42 (1991) (discussing how American gun control specifically restricted Black Americans' access to guns).

That's because such laws clearly violated the Fourteenth Amendment and are therefore not valid historical analogues under *Bruen*. The American tradition has been to expand constitutional rights to all people, and thereby live up to our founding ideals. Our society's failures to do so in the past are no excuse for injuring constitutional rights in the present. A valid and well-represented historical analogue must have applied to people generally; analogues that were intentionally designed to discriminate are not valid.

All of these parameters create what is no doubt an exacting and difficult to meet test, and it should be, given that what is at stake is a fundamental constitutional right that expressly commands it "shall not be infringed." U.S.

_____

from the colonial era through the 19th century, governments regularly disarmed a variety of groups deemed dangerous.' For instance, 'England disarmed Catholics in the 17th and 18th centuries,' and 'many American colonies forbade providing Indians with firearms.' Those examples may not help the government's case as much as the Justice Department thinks.").

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

CONST. amend. II. Here, the Ordinance cannot meet this test.

### iii. Sensitive places are narrowly defined under *Bruen*.

The burden is on the City to establish that its limitations on where people can legally carry are historically justified. Speaking to the issue of "sensitive places" where the right to bear arms may be restricted, the Court explained that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited . . . ." *Bruen*, 142 S. Ct. at 2133. So far, the Court has only provided the examples of schools and certain government buildings such as "legislative assemblies, polling places, and courthouses" as being such "sensitive places." *Bruen*, 142 S. Ct. at 2133.  Further, the Court cautioned that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly . . . [it] would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Id*. at 2133-34. The Court also warned that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2118-19. Likewise, there is no basis for the City of Glendale to enforce an ordinance effectively making all City-owned or City-affiliated property a "sensitive place" where carry is forbidden.

A federal district court in the 2nd Circuit recently explained that "although the Supreme Court has not altogether barred the expansion of sensitive locations beyond schools, government buildings, legislative assemblies, polling places and courthouses, it has indicated a skepticism of such an expansion based on the historical record." *Antonyuk*, 2022 U.S. Dist. LEXIS 182965, at *34, citing *Bruen*, 142 S. Ct. at 2133.

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

**iv.**   **The Ordinance violates the Second and Fourteenth Amendments because it is not consistent with our historical tradition of firearm regulation.**

The Ordinance indisputably burdens Second Amendment-protected conduct. The Supreme Court has confirmed "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122. The Ordinance, meanwhile, declares large swaths of Glendale off limits for the constitutional right to carry. While the Second Amendment tolerates barring firearm possession in certain "sensitive places," the Ordinance has made a mockery of the right to bear arms in Glendale, rendering it effectively useless in much of the City.

Sensitive places are intended to be the *exception* to the general rule that firearms must be permitted. To reiterate once again, the Supreme Court explained that "the historical record yields **<u>relatively few</u>** 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited . . .." *Bruen*, 142 S. Ct. at 2133 (underline and bold added). According to the Court, the historical record essentially supports three categories of places where legal firearm carry could be foreclosed: legislative assemblies, polling places, and courthouses. *Id.*, citing D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229-236, 244-247 (2018) ("D. Kopel & J. Greenlee"). Beyond that, there are no well-represented examples that meet *Bruen's* test. Places commonly thought to qualify as "sensitive" in reality lack any historical backing. For example, in the founding period, there were "statutes all over America that required bringing guns into churches, and sometimes to other public assemblies." D. Kopel & J. Greenlee, *supra*, at p. 244.

To be sure, Plaintiffs do not dispute that the City can restrict firearms at schools and certain sensitive government buildings, including "legislative assemblies, polling places, and courthouses," or any closely analogous sensitive

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

places. *Bruen*, 142 S. Ct. at 2133.[3] But the Ordinance is certainly not so limited. To recap, aside from a few exceptions which do not apply to most of Plaintiffs' members or most regular citizens, the Ordinance imposes a blanket ban on carrying firearms in the following non-exhaustive list of places: 47 parks and recreation facilities (including four community centers, one golf course, three soccer fields, and sixteen ball fields), all City playgrounds, eight public libraries, three downtown parking structures and other City-owned or operated parking lots, the Glendale Civic Auditorium and civic center complex, a youth center, an emergency center, undefined "open spaces" and "plazas", and an unknowable amount of properties in the possession of private companies or individuals under contract with the city.

In all, if someone wants to exercise their right to carry in Glendale, they now must carefully plan out exactly where they are going that day and make sure they don't go to any of the plethora of places listed above, including several privately-owned properties. Under the standard of *Bruen*, requiring an individual to reference a map and do the research to discover all city-owned and city-affiliated properties to make sure he doesn't inadvertently enter them plainly runs afoul of the right to bear arms and *Bruen's* instruction that there are "relatively few" places that qualify as sensitive. *Id*.

Perhaps the City will claim *all* its property is "sensitive". But if that were so, it would eviscerate the right to carry in Glendale, against which the Supreme Court warned. *See Bruen*, at 2133-34. Fortunately, it is not so. The City cannot claim all of these places are "sensitive", because as one judge has explained, "most places are 'sensitive' for someone. Surely that, without more, cannot categorically justify a firearms regulation in all such places. Such a conclusion would give the

---

[3] For example, the legislative findings for the Ordinance reference concerns about Glendale Community College. GLENDALE, CAL. MUNICIPAL CODE § 9.25.030(K). While laws restricting lawful carry in such places are foolish given they disarm the law-abiding while doing nothing to stop people with violent criminal intent, Plaintiffs seek only a preliminary injunction against the Ordinance, not other state or federal laws restricting carry such as the Gun Free School Zones Act.

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

government untrammeled power to restrict Second Amendment rights in any place even plausibly considered 'sensitive.'" *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1136-37 (10th Cir. 2015) (Tymkovich, J. dissenting).

As an additional example, even Ninth Circuit precedent—which prior to *Bruen* largely limited the Second Amendment's scope by upholding every law that was challenged under the Second Amendment without exception—acknowledged that banning firearms in areas like parking lots would likely not pass muster. *Nordyke v. King*, 563 F.3d 439, 459-60 (9th Cir. 2009). Yet the Ordinance includes parking lots and parking structure among its prohibited places. Not only are parking lots and structures clearly not sensitive places, but "historical analogues exist containing specific exceptions permitting the carrying firearms while travelling." *Antonyuk*, 2022 U.S. Dist. LEXIS 182965, at *41.

And its restrictions on possessing firearms on City property like parks, open spaces, libraries, and similar places runs afoul of the Supreme Court's command that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly. . . ." *Bruen,* 142 S. Ct. at 2134. "Based on the historical analogues presented to the Court thus far, the Court finds it impermissible for New York State to restrict concealed carry in . . . libraries, public playgrounds, public parks, and zoos." *Antonyuk*, 2022 U.S. Dist. LEXIS 182965, at *45-46.

Again, under the Ordinance, people with CCW permits cannot so much as take their children to a park without leaving their firearm at home and giving up their means of self-defense. It is simply inconceivable any court would allow such extensive location-based restrictions on any other right, and the Second Amendment should be no different. The City already implicitly knows these places are not truly "sensitive." As the Kopel & Greenlee article that the Supreme Court approvingly cited in *Bruen* explains:

The government's behavior can demonstrate the true importance of the

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

alleged government interest. Passing a statute declaring some place to be a 'gun free zone' does nothing to deter criminals from entering with guns and attacking the people inside. In contrast, when a building, such as a courthouse, is protected by metal detectors and guards, the government shows the seriousness of the government's belief that the building is sensitive. . .

. . . Screening and armed guards reduce the burden that is inflicted on citizens by locational arms bans. Disarmed, the citizen in a sensitive place cannot defend herself. But when there are metal detectors, the citizen is assured that criminals cannot bring in guns. When armed guards are present, the government takes the responsibility for having armed force at the ready to protect citizens.

Conversely, when the government provides no security at all--such as in a Post Office or its parking lot--the government's behavior shows that the location is probably not sensitive; further, the disarmament burden inflicted on citizens is not mitigated by alternative protectors supplied by the government.

D. Kopel & J. Greenlee, at p. 292.

The Ordinance does nothing to actually protect the places it declares to be "sensitive." The City's lack of security at the places the Ordinance covers confirms that Defendants do not consider these places to be truly sensitive. Compare this to actually sensitive places like courthouses, which have police and metal detectors at the door, or schools, which are often guarded by resource officers who are always on the premises. The Ordinance is not about safety, because if it were, it wouldn't strip law abiding citizens of their ability to carry in its list of prohibited places without providing security at such places.

> **v.   The only relevant historical examples are insufficient analogues to support the Ordinance because they did not aim to prohibit peaceable carry, or they are historical outliers.**

Setting aside the places for which the historical record provides support, such as courthouses, polling places, and certain government buildings, the Ordinance has no well-represented historical analogues it can rely on. Even many of the ones that do exist focus on restricting carry when someone has criminal intent. As one example of this which the Supreme Court also cited, Virginia had a law in 1794 which stated that "no man, great nor small, [shall] go nor ride armed by night nor

13

by day, in fairs or markets, or in other places*, in terror of the Country*". *Bruen*, 142 S. Ct at 2144, italics added (quoting Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794), 1786 Va. Laws 35). Other examples similar to the Virginia law certainly exist, but they all have something in common: "[t]hey prohibit bearing arms in a way that spreads "fear" or "terror" among the people." *Id*. at 2145.

Similarly, in handling New York's claim that all of Times Square was a sensitive place where carry could be prohibited,  a district court explained that "one might argue that historical statutes banning the carrying of guns in 'fairs or markets' are analogous to this prohibition. However, thus far, only two such statutes have been located. Setting aside the fact that the first one appears to apply only to carrying a gun offensively ("in terror of the Country"), and the fact that the second one appears to depend on royal reign, as stated before, two statues do not make a tradition." *Antonyuk*, 2022 U.S. Dist. LEXIS 182965, at *45.

Plaintiffs' members, of course, have no intention to spread fear or terror. They have lawfully acquired CCW permits, and simply want to continue to peaceably carry them concealed to the non-sensitive places in Glendale they frequent.

Some other laws that existed were outliers. For example, New York banned carrying firearms within Central Park in 1861. But even if Central Park is an appropriate analogy to any regular park, such as those in Glendale, the 1861 law is an outlier. Remember, *Bruen* struck down the Sullivan Act despite a smattering of similar laws in the 19th Century, because those laws clearly were not the majority position. *Id*. at 2138-56. An old restriction on carrying in Central Park is not enough to meet the historical test. Other laws, such as an expansive 1870 Texas law that prohibited carry in churches and social events, were also outliers that did not represent what the majority of states, or even just *many* states, were doing at the time. Indeed, the Supreme Court said of similarly old Texas restrictions that while

14

they "recognize the support that postbellum Texas provides for respondents' view," they "will not give disproportionate weight to a single state statute and a pair of state-court decisions." *Id*. at 2153.

As for the Ordinance's prohibition on carrying on any private property under contract with the city to perform a public purpose, it flips directly on its head the traditional practice for private property, especially property belonging to businesses which serve the general public. Usually, if a private property owner wants to exclude people, they must post signs letting everyone know who or what actions are prohibited. While it is true that some spaces are so private that there need not be signage to announce they exclude people, that does not apply to places of business open to the general public because they are "by positive law and social convention, presumed accessible to members of the public unless the owner manifests his intention to exclude them." *Oliver v. United States*, 466 U.S. 170, 193 (1984) (Marshall, J., dissenting).[4]

Moreover, while businesses open to the public do have a broad right to exclude people from their establishments (*Carrillo v. Penn Nat'l Gaming, Inc*., 172 F. Supp. 3d 1204, 1217 (D.N.M. 2016)), the Ordinance involves <u>the government</u> deciding to exclude people from private property for exercising a constitutional right. The federal district court in New York commented on a somewhat similar provision in that state's law, ruling that it was inappropriate because the government was "now making a decision for private property owners that they are perfectly able to make for themselves . . . as well as arguably compelling speech on a sensitive issue. In any event, however, this policy dispute is irrelevant, because it

---

[4] See also *United States v. Byle*, No. 8:10-CR-419-T-30TGW, 2011 U.S. Dist. LEXIS 54220 (M.D. Fla. Apr. 15, 2011) (reasoning that owner's intent to exclude visitors was not apparent because gate was not locked and no "No Trespassing" signs were posted); and *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1096 (N.D. Fla. 2016) ("Thunder Beach contains no barricades, barriers, or attendants meaningfully limiting egress and ingress. It contains no signs conveying a message to the effect of 'private event—no trespassing.' Any person can choose to walk in to the event just as one could choose to walk to the same location on a given weekend when an event is not being held").

POINTS & AUTH. IN SUPPORT OF PLA'S MTN. FOR PRELIMINARY INJ.

does not regard the Supreme Court's 'historical tradition' standard." *Antonyuk*, 2022 U.S. Dist. LEXIS 182965, at *49.

The City can look for itself, and no doubt it will do so to prepare its opposition to this motion. It will not find "well-established and representative" historical analogues supporting the Ordinance. *Bruen*, 142 S. Ct at 2133. The Ordinance is contrary to the Second and Fourteenth Amendments and must be enjoined.

### vi. The Ordinance violates due process by depriving Plaintiffs' members of notice as to which places are off limits for carry.

To the extent Plaintiffs' members attempt to lawfully carry anyway, despite the Ordinance making so much of Glendale off limits for carry, they are highly likely to *accidentally* break the law. While it is clear that the City's libraries are restricted because they are mentioned specifically, the Ordinance also forbids firearm possession in City-owned "parks, playgrounds, open space, plazas, community centers . . . parking lots, and parking structures." Left vague is how Plaintiffs' members are supposed to *know* whether any given park, playground, plaza, parking structure, or "open space" is City-owned or not. As discussed previously, the Ordinance also decrees, in equally vague fashion, that properties belonging to "private entit[ies], corporation[s], or person[s] under contract with the city to perform a public purpose" also bar firearm possession.

Unraveling where exactly the Ordinance prohibits firearms would be an extensive exercise in itself. Indeed, some pieces of the Ordinance are unconstitutional simply for being too vague. See, e.g., *People v. Leon*, 181 Cal. App. 4th 943, 952 (Ct. App. 2010) (deciding that a probation condition requiring a defendant not frequent areas with gang-related activity was unconstitutionally vague because Defendant could not always reasonably know when he was in such an area). For the same reason, the Ordinance also violates Plaintiffs' members'

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

right to due process. As the Supreme Court has explained, "[i]ngrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges. Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed." *Lambert v. California*, 355 U.S. 225, 228 (1957).

Because the Ordinance doesn't require places where carry is forbidden to post signs saying as much, it robs Plaintiffs' members of notice that they are entering a place where carry is not plainly forbidden. While some places may be obvious in terms of general knowledge that carry is not allowed in them, such as schools and courthouses, most places the Ordinance forbids are not. Plaintiffs are aware of the legal danger of such inadvertent crimes, and the Ordinance has thus chilled their members' right to carry in Glendale.

In sum, the Ordinance denies Plaintiffs' members notice in violation of due process and burdens conduct protected by the Second Amendment. Defendants will not be able to "justify [their] regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30. As such, Plaintiffs' likelihood of succeeding on the merits is exceedingly high. Accordingly, they are entitled to a preliminary injunction.

### B.    Plaintiffs' Members Will Suffer Irreparable Harm if Denied Relief

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' " *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). The Ninth Circuit has imported the First Amendment's irreparable-if-only-for-a-minute rule to cases involving other rights and, in doing so, has held a deprivation of these rights

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

irreparable harm per se. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The Second Amendment should be treated no differently. *See McDonald*, 561 U.S. at 780 (2010) (refusing to treat the Second Amendment as a second-class right subject to different rules); *see also Ezell v. Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) (a deprivation of the right to arms is "irreparable and having no adequate remedy at law"); and *Duncan v. Becerra (Bonta)*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017) ("Loss of . . . the enjoyment of Second Amendment rights constitutes irreparable injury.") In the context of rising violent crime in California, Plaintiffs' members desire to be able to carry in all non-sensitive places in Glendale for their own safety as well as that of their families. While any violation of a constitutional right is an irreparable harm, even more serious is the possibility of falling victim to a crime because the Ordinance prevented Plaintiffs' members from exercising their right to carry. And all of this is, of course, in addition to the constitutional claims raised related to California Code of Civil Procedure section 1021.11.

## C.    The Balancing of the Equities Sharply Favors Plaintiffs

### i.    The Constitution forbids restricting protected conduct on the basis of a claimed "public safety" rationale.

This factor considers the "balance of hardships between the parties." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137 (9th Cir. 2011). In contrast to Plaintiffs' members' injury of being denied their Second Amendment right to carry in non-sensitive places, Defendants suffer no injury because there is no plausible, identifiable interest that infringing Plaintiffs' members' constitutional rights serves. Indeed, Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice. . . ." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir 2013); *see Valle del Sol Inc. v. Whitting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable . . . to allow the state . . . to violate the requirements of federal law.") (citations omitted).

18

Furthermore, "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Bruen*, 142 S. Ct. at 2127.  So whatever alleged public safety interests the City may have had to enact the Ordinance make no difference here; public-safety oriented interest balancing is not part of the Second Amendment analysis. Moreover, although there is obviously a "problem of handgun violence in this country . . . the enshrinement of constitutional rights necessarily takes certain policy choices of the table." *Heller*, 554 U.S. at 636. Afterall, "[t]he right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications." *McDonald*, 561 U.S. at 783.

### ii. Even if the City could consider public safety interests, which it cannot, it would not prevail because people with carry permits commit crimes at a lower rate than the public at large.

The City may not argue that a balancing of competing interests (such as claimed public safety interests) justifies its Ordinance because the Second Amendment "is the very product of an interest balancing by the people…" *Heller*, 554 U.S. at 635. "It is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Bruen*, 142 S. Ct. at 2131. But even if the City *could* take public safety interests into account here, it would have no evidence to support its public safety rationale for one fundamental reason: people who have lawfully applied for and received concealed carry weapon permits are extraordinarily unlikely to commit violent crimes. In contrast to criminals who do not bother getting a carry permit and just carry illegally (and almost certainly ignore the Ordinance as well as all other laws like it), Plaintiffs' members with CCW permits are part of a class of people who have demonstrated a considerable predisposition to following the law simply by going through the process to obtain a carry permit before carrying their firearms. In other words, people who go through the trouble of applying for a CCW permit (and going through all the other necessary steps and fees to get one) are just not the type of people who are likely to

19

be violent criminals.

While all of this is certainly in line with common sense, this is also not conjecture or hypothesis. There is considerable data from other states which demonstrates how stunningly low crime rates are among people with carry permits. Take Texas as one example. In 2020 Texas had 1,626,242 active conceal carry weapon license holders. Request for Judicial Notice in Support of Pls.' Mot. Prelim. Inj. ("RJN"), ¶ 1, Ex. 1. That made people with such licenses 5.7% of Texas's population, yet according to the Texas Department of Public Safety, they only committed 0.4334% of the State's serious crimes, being responsible for just 114 out of a total of 26,304 convictions. *Id*., ¶ 2, Ex. 2. Even among those few convictions, only some of the crimes involved a gun at all. And of the ones that do, license holders are responsible an even smaller proportion of them. For example, there were 1,441 convictions for aggravated assault with a deadly weapon in 2020, but people with a valid concealed weapon license were just 4 of those, or 0.2776% of the total, again way below their 5.7% share of the population as a whole. *Id*.

The State of Florida confirms this phenomenon as well. As of September 30, 2022, the State had issued a total of 5,485,676 concealed weapon licenses since October 1, 1987, of which 2,578,630 are currently active. RJN, ¶ 3, Ex. 3. In that nearly 25-year timespan, only 17,286 permits have been revoked without being subsequently reinstated, or roughly 0.3% of the total issued. *Id*.[5]

---

[5] Florida was also the state where the modern right-to-carry movement originally gathered steam, though a handful of states had liberal permit-issuance policies before then. The State's enactment of shall-issue permitting was met with breathless predictions of wild-west style violence and "blood in the streets," but none of that happened. Indeed, at least one prominent opponent admitted his error, with Florida Representative Ronald A. Silver stating in 1990 that "[T]here are lots of people, including myself, who thought things would be a lot worse as far as that particular situation [carry reform] is concerned. I'm happy to say they're not." Clayton E. Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 Tenn. L. Rev. 679, 692-93 (1995). John Fuller, general counsel for the Florida Sheriffs Associated, added: "I haven't seen where we have had any instance of persons with permits causing violent crimes, and I'm constantly on the lookout." *Id*. The Metro Dade Police Department originally kept detailed records of every incident involving concealed weapon licensees from enactment of the new law in 1987 until August 31, 1992 but stopped because the rarity of such

20

POINTS & AUTH. IN SUPPORT OF PLA'S MTN. FOR PRELIMINARY INJ.

Finally, the State of Minnesota goes a step further and identifies not just the infrequent crimes committed by people with valid carry permits, but also what proportion of those crimes involve firearms. According to the Minnesota Department of Public Safety, the state had 387,013 valid carry permits in 2021, and only 40 permits were revoked that year. RJN, ¶ 4, Ex. 4. In addition, 3,863 crimes were committed by people with carry permits. *Id*. This sounds much larger than the statistics from Texas or Florida, but that is only because of Minnesota's broad definition of what constitutes a "crime". Indeed, of those 3,863 crimes, more than 60% were DWI's or other traffic offenses. *Id*. Just over 2% of the crimes, or about 80 of them, were crimes in which a firearm was used in furtherance of the crime. *Id*. In other words, in Minnesota, only about 0.02% of people with carry permits used a firearm in furtherance of a crime in 2021.

The evidence from California supports Plaintiffs too. When the state legislature recently tried to pass a law (Senate Bill 918) that would have violated the right to carry by making most public places off limits even for those with a CCW permit, it was opposed by the California State Sheriffs Association partially because of the fact that people with CCW permits almost never commit crimes and are not a problem for law enforcement. The Association stated in a letter to all members of the California State Assembly that "*individuals who go through the process to carry concealed legally are exceedingly unlikely to violate the law*, yet SB 918 turns much of the state into 'no-carry' zones that will do nothing to foster public safety." (Italics added.) RJN, ¶ 5, Ex. 5, italics added.

There are certainly more states with similar data that could be examined here, but Plaintiffs believe the evidence presented here makes the point: Even if the City could use "public safety" as a reason to curtail the right to carry in places that are not truly sensitive, which it cannot do under *Bruen*, people with carry permits are

---

incidents caused the department to cease tracking them. *Id*.

21

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.

dramatically more law abiding than the population as a whole and are thus very unlikely to ever pose a threat the City needs to be concerned about. Fear of licensed permit holders is completely irrational, given the evidence presented here.

### D.   PRELIMINARY INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

When challenging government action that affects the exercise of constitutional rights, "[t]he public interest . . . tip[s] sharply in favor of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). As the Ninth Circuit has made clear, "all citizens have a stake in upholding the Constitution" and have "concerns [that] are implicated when a constitutional right has been violated." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) (emphasis added). Thus, not only are Plaintiffs' members' rights at stake, but so are the rights of all Californians with CCW permits who visit Glendale seeking to engage in conduct that the Ordinance prohibits, as well as all those who would seek to vindicate all of the constitutional rights that section 1021.11 violates. The public interest therefore tips sharply in Plaintiffs' favor. *Klein*, 584 F.3d at 1208.

### 4.   CONCLUSION

Glendale's Ordinance is unmistakably unconstitutional under *Bruen*. For the aforementioned reasons, Plaintiffs implore this Court to grant their motion to preliminarily enjoin Glendale Municipal Code section 9.25.040(A), as it has deprived their members of any meaningful right to carry within the City despite their status as lawful and valid CCW permit holders.

Respectfully Submitted,

Dated:  October 20, 2022          **MICHEL & ASSOCIATES, P.C.**

/s/ C.D. Michel
C.D. Michel
Counsel for Plaintiffs California Rifle & Pistol
Association, Incorporated and Gun Owners of
California, Inc.

1    Dated:  October 20, 2022          **LAW OFFICES OF DON KILMER**

2                                      */s/ Don Kilmer*
                                       Don Kilmer
3                                      Counsel for Plaintiff Second Amendment
                                       Foundation
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

POINTS & AUTH. IN SUPPORT OF PLA'S' MTN. FOR PRELIMINARY INJ.